Mary K. Hoff, Presiding Judge
Peter Sarandos ("Sarandos") appeals from the trial court's grant of summary judgment in favor of the Loop Trolley Transportation District ("District") and the Loop Trolley Company ("Trolley Company") (collectively "Respondents") on Sarandos's action for declaratory judgment and permanent injunction brought to prohibit construction and operation of a trolley-car rail system along Delmar Boulevard, from the Loop in University City to Forest Park in St. Louis ("Project") 535 feet beyond the boundaries of the District. We affirm.
Factual and Procedural History
The relevant parties in the current action are as follows: The District is a political subdivision of the State of Missouri created in accordance with the Missouri Transportation Development District Act, Sections 238.200-.275, RSM0 2000[1] ("TDD Act"), that authorizes the creation of transportation development districts to plan, fund, and construct transportation and related infrastructure projects. The Trolley Company is a non-profit corporation that *385 contracts with the District related to the operation of the Project. Sarandos, along with Elsie Beck Glickert ("Glickert") and Jen Rivenes Jensen ("Jensen"), are residents and taxpayers of the City of St. Louis ("St. Louis City") and the City of University City ("University City"), respectively, who filed the underlying action challenging the construction and operation of the Project.[2]
The District and the Project
In 2007, pursuant the TDD Act, St. Louis City and University City each passed and approved resolutions calling for the joint establishment of the District, for the purpose of "funding, promoting, planning, designing, constructing, improving, maintaining, and operating" the Project.
In August 2007, University City filed a petition in the St. Louis County Circuit Court ("Formation Petition") seeking to create a transportation development district under the TDD Act, for the undertaking of the Project and the imposition of a one-percent sales tax ("Sales Tax") in the District.
The Formation Petition set forth the legal description for the proposed District, including a map illustrating such boundaries as required under the TDD Act and a general description of the Project ("Project Description"), which stated that the "approximate location of the Project improvements will be along Delmar Boulevard between Kingsland Avenue and DeBaliviere Avenue and along DeBaliviere Avenue between Delmar Boulevard and Lindell Boulevard within the boundaries of the District." The Project Description further "anticipated that the Project may also include" various activities and work necessary or convenient for the purpose of funding, promoting, planning, designing, constructing, improving, maintaining, and operating or assisting in the Project, such as the construction of one or more turn-around areas for the rail system, and other improvements located within or adjacent to Delmar Boulevard and DeBaliviere Avenue.
Following published notice of the filing of the Formation Petition, the trial court issued its Order dated December 18, 2007 approving a mail-in election and certifying for qualified-voter approval, submitting a single question regarding creation of the proposed District, "for the purpose of funding, promoting, planning, designing, construction, improving, maintaining and operating or assisting in (a) design, construction and installation of improvements along Delmar Boulevard and DeBaliviere Avenue necessary for a trolley-car system; ... (c) construction of one or more turn around areas for vehicular traffic and/or rail system; ... (g) all other costs and fees necessary or incidental to the foregoing" and approval of the proposed Sales Tax. The results of the mail-in election were reported as being 38.097 votes in favor of the ballot question and 0.88 votes against, which was an overwhelming majority in favor of the Project. Sarandos, who owns commercial property within the District, cast a ballot against the District.
In July 2008, following voter approval, the trial court entered its final judgment ("Formation Judgment") in which it established the District as a political subdivision in accordance with the TDD Act and authorized the Sales Tax. In addition, just as in the Formation Petition, the Formation Judgment contained the Project Description in which it provided a "general description"
*386 of the Project, an "approximate" location for the Project, as well as gave the District broad authority to "also" construct improvements necessary and convenient for the proposed trolley-car system.
From August 2008 to March 2016, the District collected approximately $5,034,679 in Sales Tax, which generated funds used for planning, design, implementation, and construction of the Project.
In addition to the funds generated from the Sales Tax, the District also obtained a grant from the Federal Transportation Administration ("FTA") to help finance the Project. On August 23, 2013, the District was granted $22.1 million from the FTA.
In November 2012, the Trolley Company submitted an application for a conditional use permit to University City to build and operate the trolley project, which was granted on March 11, 2013. It included a proposed route extending in front of the University City Library west of the District boundary at Kingsland Avenue.
Since 2000, and well before the formation of the District in 2008, plans for the Project have been the subject of considerable public discussion and media attention as well as the subject of discussions at community meetings and in public documents. Throughout the planning process, the general public, community leaders, government agencies, and local neighborhoods have been involved in the Project.
Since 2008, the District's plans have included Project improvements beyond the District boundaries on both ends of the route. Moreover, as early as 2004, plans for the Project contemplated extension of the system accordingly.
Specifically, the final plans for the Project included an extension of the trolley-car route 300 feet, beyond the District's boundaries on the eastern end of the line, to provide a connection to Forest Park, and an extension of 235 feet beyond the District's boundaries on the western end of the line, to provide a feasible terminus for the system. The final plans fell within the approximate Project location as defined in the Formation Judgment.
In January 2015, contractors received notice to proceed with construction of the Project and construction commenced immediately thereafter. As of December 2015, construction in the challenged areas of the Project route had commenced.
As of April 2016, implementation of the Project was substantially complete: track 85%, maintenance facility 70%, catenary system 85%, first two trolleys 80% and utilities 95%. Construction costs totaled $46.96 million with overall project costs at $50.90 million.[3]
The Lawsuit
On October 29, 2013, Sarandos and the other plaintiffs filed their claim for declaratory and injunctive relief against the District, and others, in federal court, raising a federal constitutional claim as well as other claims. The district court dismissed on the issue of standing and granted the District's motion for summary judgment as to Sarandos's claims. Plaintiffs appealed, and on July 1, 2015, the Eighth Circuit affirmed the district court's dismissal and its grant of summary judgment. Glickert v. the Loop Trolley Trans. Development Dist., 792 F.3d 876 (8th Cir. 2015).
On July 20, 2015, Sarandos filed his Petition for Declaratory Judgment and Permanent Injunction in state court alleging that the District lacks authority to *387 build, maintain, and operate the Project beyond the boundaries of the District.[4]
On June 17, 2016, the District moved for summary judgment on the grounds of laches and because neither the TDD Act nor the Formation Judgment "limit the location of Project improvements." The Trolley Company joined in that motion.
On March 16, 2017, the trial court granted the District's motion. With respect to the laches claim, the trial court held that "[t]he undisputed facts show Sarandos unreasonably delayed in bringing this action." The trial court determined that this unreasonable delay caused the District legal detriment and that "overall fairness" supported application of laches because, if the requested relief was granted, the trolley route would need to be redesigned and portions of the track would need to be removed and rebuilt. "Thus, allowing the trolley system to operate as currently designed and constructed serves the public interest."
The trial court further held that the District was entitled to summary judgment because neither the TDD Act nor the Formation Judgment prohibited the design of the route: "By requiring only a description of the 'approximate' location in the Formation Petition, the Legislature recognized the need for flexibility in designing and implementing a transportation project." The trial court determined that the project was located within the "approximate" location described in the Project Description in the Formation Petition and Formation Judgment and that the improvements beyond the District boundaries were authorized as additional activities and work "necessary" or "convenient" to the Project. Sarandos now appeals.
Standard of Review
Summary judgment allows a trial court to enter judgment for the moving party where the party demonstrates a right to judgment as a matter of law based on facts about which there is no genuine dispute. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). Our review is essentially de novo. Id. When considering an appeal from summary judgment, we review the record in the light most favorable to the party against whom the court entered judgment. Id.
"A 'defending' party may establish a right to summary judgment by demonstrating: (1) facts negating any one of the elements of the non-movant's claim; (2) 'that the non-movant, after an adequate period for discovery, has not been able and will not be able to produce sufficient evidence to allow the trier of fact to find the existence of any one' of the elements of the non-movant's claim; or (3) 'that there is no genuine dispute as to the existence of facts necessary to support movant's properly pleaded affirmative defense.' " Goerlitz v. City of Maryville, 333 S.W.3d 450, 453 (Mo. banc 2011) (quoting ITT Commercial Fin. Corp., 854 S.W.2d at 381 ).
Discussion
Sarandos raises two interrelated points on appeal. For the sake of clarity, we address these points together. First, Sarandos argues that the trial court erred in barring his claim under the doctrine of laches because the summary judgment record did not support such a finding. Second, Sarandos argues the trial court erred and misapplied the law in holding that the District could build and operate the Project *388 beyond the District boundaries because neither the TDD Act nor the Formation Judgment permitted such a deviation. We disagree.
With respect to the laches argument, the uncontroverted facts establish that the trial court properly barred Sarandos's claim under this affirmative defense and that the trial court properly granted the District's right to judgment as a matter of law. Based on the record before us, Sarandos knew or could easily have ascertained the District's plan to extend the trolley route beyond the District boundaries years before he filed suit but instead he unreasonably delayed in bringing this action.
"The invocation of laches requires that a party with the knowledge of facts giving rise to its rights unreasonably delays asserting them for an excessive period of time and the other party suffers legal detriment therefrom." Nahn v. Soffer, 824 S.W.2d 442, 444-45 (Mo. App. E.D. 1991). In determining whether the doctrine of laches applies in a particular case, an examination is made of "the length of delay, the reasons therefor, how the delay affected the other party, and the overall fairness in permitting the assertion of the claim." Id. at 445.
"The prejudice and disadvantage which supports laches is generally of two kinds: (1) the loss of evidence which would support the Respondents' position and (2) a change in position in a way that would not have occurred but for the delay. Port Perry Marketing Corp. v. Jenneman, 982 S.W.2d 789, 792 (Mo. App. E.D. 1998) (quoting Lyman v. Walls, 660 S.W.2d 759, 761 (Mo. App. E.D. 1983)).
Moreover, "laches has been said to be neglect for an unreasonable and unexplained time, under circumstances permitting diligence, to do what in law should have been done." Stenger v. Great S. Sav. & Loan Ass'n, 677 S.W.2d 376, 383 (Mo. App. S.D. 1984). In other words, "knowledge for purposes of equitable defenses need not always be actual as circumstances and a duty to be vigilant may combine to make a party deemed knowledgeable of what the exercise of his required vigilance would have disclosed." Russell v. Russell, 427 S.W.2d 471, 478 (Mo. 1968). Here, the uncontroverted facts established that Sarandos could easily have obtained sufficient information to assert his claims years prior to filing the underlying action in 2015.
Nearly a decade earlier, in 2007, City of St. Louis and University City passed resolutions to create the District for the broad purposes of developing a trolley system along Delmar and DeBaliviere. Thereafter, University City filed the Formation Petition and, in 2008, the trial court entered the Formation Judgment which, inter alia , designated the approximate location of the Project. Moreover, the specific language included in both the Formation Petition and also the Formation Judgment allowed improvements beyond District boundaries as necessary or convenient to implement the Project.
The record before us clearly indicates that the Project plans have always been easily accessible through public records. For example, from 2004 onwards, the trolley project and current route have been discussed in local newspaper articles and on television. In addition, the trolley plans and proposed route have been posted on the District's website since January 2008. From 2008, when the District was formed, the District's planning process involved coordination and discussion with community leaders, government agencies, institutions, local neighborhoods, and the general public and possible extension beyond the District boundaries on both ends of the route has been part of the District's plans since its 2008 formation. In 2010, when the *389 grant application and plans for the Project were submitted to the FTA, the plans showed the proposed route extending beyond the District boundaries on both ends.
Sarandos contends that his delay in taking action is a result of the plans not being final until University City issued the conditional use permit in March of 2013. Even assuming there were minor changes to the design of the terminus on each end of the route, plans consistently contemplated extensions beyond District boundaries on both ends of the route. The undisputed facts, including Sarandos's own recitation of the sequence of events in the route planning and approval between 2011 and 2013, confirm that every version of the plans during this timeframe included extension beyond District boundaries on both ends of the route. Additionally, Joe Edwards ("Edwards"), the Chairman of the Board of Directors for the District, testified by affidavit that, "[t]he proposed trolley route ha[d] included a portion of the line into Forest Park on the east end of the trolley-car line and past Kingsland Avenue on the west end of the trolley-car since planning efforts for the Project commenced in 2008." Edwards further testified that since January 2008, the Project's website had been actively providing information about the Project and the proposed route.
As the trial court correctly held, there was uncontroverted evidence in the record that, "[t]he District's plan to extend certain trolley project improvements beyond the District boundaries was available to the public, including Sarandos, since at least 2010."
Even after approval of the conditional use permit application with a route extending beyond the District boundaries, in 2013, Sarandos waited another two years before filing this suit. As the trial court explained, "At minimum, a plaintiff exercising diligence would have brought this action by March 11, 2013, when University City granted a conditional use permit to build and operate the trolley project west of the District boundary at Kingsland Avenue."
Finally, Sarandos asserts that laches period was essentially tolled when he filed the federal lawsuit in 2013. But this argument is of no avail. Even after the federal district court dismissed the case in April of 2014, the underlying action was not filed for another fourteen months, after the Eighth Circuit's decision, which affirmed the district court's decision on July 1, 2015.
The record further shows that Sarandos did not seek any form of preliminary injunctive relief in conjunction with that federal suit, nor did he make any effort to halt construction since he first filed suit in October of 2013. Instead, as Respondents correctly point out, part of what Sarandos seeks to permanently enjoin, construction of the Project beyond the District boundaries, has already occurred. And as the trial court found, the record contains ample, undisputed evidence that the District would be prejudiced by Sarandos's unreasonable delay if the requested relief is granted.
Here, the District expended considerable resources in design and construction of the Project. Based upon the plans submitted to the FTA in 2010, the District obtained federal funding, totaling approximately $25 million, as well as approvals from agencies or bodies within University City and St. Louis City. Construction of the Project began in 2015 and construction in the contested areas had commenced after the District filed its motion for summary judgment. Moreover, the District's financial reports disclose that the District incurred substantial expenditures on the Project annually between 2010 and 2015.
*390 The District presented uncontroverted evidence that if construction were to be enjoined beyond District boundaries, the District could not simply truncate the route at the District boundaries, but instead would have to redesign the entire project at significant cost. Evidence supported that if the Project was limited to District boundaries, as proposed by Sarandos, the District would have to secure funding and approvals to redesign the line. According to Edwards and Chris Poehler ("Poehler"), the Chairman of the Board of Directors for the District and the District Administrator for the District respectively, the total cost of the lost work and improvements together with the redesign and additional construction work, would cost the District a minimum of $5 million of non-grant funds. Additionally, both Edwards and Poehler confirmed that had a court enjoined construction beyond District boundaries, the District would have planned the Project differently long before construction commenced. Poehler testified that were the Project to be limited to District boundaries, at least 20 additional steps would be necessary to implement the new plan, including but not limited to, modifications to the environment assessment report, renegotiations of multiple contracts with respect to construction and design, modification and re-approval of agreements with both City of St. Louis and University City, as well as removal of existing infrastructure.
As the record clearly demonstrates, the District invested considerable resources in planning and design for the entire project years before construction commenced and, importantly, this information was available to Sarandos. Therefore, the undisputed facts before the trial court support its application of laches based upon the "overall fairness" of the circumstances, as the Project is now essentially complete. In the context of summary judgment, the undisputed facts support the application of laches where, as here, such is the only reasonable inference that can be drawn from the established facts. State ex rel. City of Monett v. Lawrence Cnty. 407 S.W.3d 635, 639 (Mo. App. S.D. 2013). The record as a whole supports Respondents' motion for summary judgment on their affirmative defense of laches and Respondents were entitled to summary judgment based on this theory. Point I is denied.
Additionally, the trial court properly determined that neither the TDD Act nor the Formation Judgment barred the District from building and operating the Project with minor extensions beyond District boundaries. The plain language of the TDD Act and the Formation Judgment so provides.
The TDD Act provides flexibility in design of the Project. Specifically, the TDD Act states that the purpose of a district is to "fund, promote, plan, design, construct, improve, maintain, and operate one or more projects or to assist in such activity." Section 238.205(1). Similarly, the TDD Act does not limit project improvements to the district boundaries or require that district funds be expended solely within the district. In fact, the plain language of the TDD Act expressly grants a district such implied powers as may be "necessary or convenient" to execute its purposes, thereby allowing districts flexibility with respect to transportation projects:
In addition to all other powers granted by sections 238.200 to 238.275 the district shall have the following general powers:
* * * *
(5) To exercise such other implied powers necessary or convenient for the district to accomplish its purposes which *391 are not inconsistent with its express powers.
Section 238.252 (emphasis added).
Consistent with the TDD Act, the Project Description in both the Formation Petition and TDD Judgment states that the "approximate location" of the Project improvements is along Delmar Boulevard between Kingsland Avenue and along DeBaliviere Avenue between Delmar Boulevard and Lindell Boulevard within the boundaries of the District. Additionally, Section 238.207.5 provides the formation petition shall set forth the following: "[a] specific description of the proposed district boundaries including a map illustrating such boundaries" and "[a] general description of each project proposed to be undertaken by the district, including a description of the approximate location of each project." Section 238.207.5(3)(d) and (e) (emphasis added). Thus, by its language, the legislature contemplated that local transportation authorities needed flexibility to design and implement a project and did not specifically prohibit a slight deviation beyond district boundaries.
Similarly, the Mail-In Ballot, which the trial court approved, stated that the Project authorized construction of the trolley system within the District boundaries and, in addition to that work, the other activities and work specified therein, specifically, "funding, promoting, planning, designing, construction, improving, maintaining and operating or assisting in (a) design, construction and installation of improvements along Delmar Boulevard and DeBaliviere Avenue necessary for a trolley-car system; ... (c) construction of one or more turn around areas for vehicular traffic and/or rail system; ... all other costs and fees necessary or incidental to the foregoing ...." Finally, the general description of the Project further reinforces this interpretation of the statute to allow flexibility in designing and executing a transportation project:
[T]he Project may also include, but is not limited to: all activities and work necessary for the purpose of funding, promoting, planning, designing, constructing, improving, maintaining and operating or assisting in: (a) the design, construction and installation of improvements along Delmar Boulevard and DeBaliviere Avenue necessary for a trolley-car rail system; ... (c) construction of one or more turn around areas for vehicular traffic and/or rail system ; ... (f) design, construction and installation of surface and/or structured parking or pedestrian related improvements; and (g) all other costs and fees necessary or incidental to the foregoing . Such activities and work may also include, but is not necessarily limited to ... (3) completion of activities necessary or convenient for construction, re-construction, repair or use of ... trolley track, trolley car, or related improvement ... (5) the construction, rehabilitation, development or redevelopment of other improvements located within or adjacent to Delmar Boulevard and DeBaliviere Avenue.... [Emphasis added].
In addition to the express language of the TDD Act and Project description, testimony of both Edwards and Poehler reinforced the fact that the extensions of the trolley line were "necessary, incidental, and convenient" to the Project and that these extensions were essential to the successful and safe implementation of the of the Project as well as financially beneficial to the entire district. Specifically, Edwards pointed to the following examples of how the extension of the trolley line into Forest Park and past Kingsland Avenue was "necessary, incidental, and convenient" to the Project:
*392 • increasing ridership and revenue by providing a stop within Forest Park, thus better accessing and serving the 13 million annual visitors who visit Forest Park and the various tourist attractions within Forest Park;
• providing a safe stop for riders to embark and disembark within Forest Park in lieu of forcing riders to cross on foot the intersections of Forest Park Parkway and DeBaliviere Avenue and Lindell Boulevard and DeBaliviere Avenue; and
• providing a safe stub termini for the trolley to be able to stop in Forest Park and then switch travel directions and proceed back to the Loop along DeBaliviere Avenue without causing safety issues and without causing traffic congestion at either the Forest Park Parkway and DeBaliviere Avenue intersection or the Lindell Boulevard and DeBaliviere Avenue intersection.
* * * *
• providing a safe stub termini and a location for the double tracks east of Kingsland Avenue to be merged into a single track and allow the transportation project to stop and then switch travel directions to proceed back east along Delmar Boulevard without causing safety issues and minimizing congestion along Delmar Boulevard; and
• better serving the destinations of COCA and Washington University School of Music located west of Kingsland Avenue.
Based on our review of the whole record, the trial court correctly found that the disputed trolley improvements fall within the "approximate" Project Description, despite the slight extension of the route a few hundred feet beyond the boundaries on each terminus. Moreover, all of the District's improvements and activities within the challenged areas fall within the broad categories of "additional" items enumerated in the Formation Judgment and were "necessary, incidental, and convenient" to the implementation of the Project. The trial court did not err in finding that the District was entitled to summary judgment because, as constructed, the Project is consistent with both the TDD Act, Formation Judgment, as well as voter approval. Point II is denied.
Conclusion
The judgment is affirmed.
Robert G. Dowd, Jr., Judge and Kurt S. Odenwald, Judge: concur

Unless otherwise indicated, all further references are to RSMo 2000 as amended.

The trial court held that neither Glickert nor Jensen had standing to pursue their claims, and they do not appeal that decision. Sarandos is the only party appealing the trial court's grant of summary judgment.

At oral argument, Respondents' attorney noted that the physical construction for the Project was complete with operation of the trolley scheduled to commence sometime in early 2018.

Prior to the filing of the petition in state court, Sarandos did not seek any injunctive relief in state court in conjunction with the federal suit. Between 2013 and 2015, during the pendency of the federal suit, construction on the Project continued as planned.